**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 31, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

EUGENE JOHNSON,

      Plaintiff-Appellant,

v.

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

      Defendant-Appellee.

No. 07-6115
(D.C. No. CIV-06-0356-HE)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH**, **BALDOCK**, and **EBEL**, Circuit Judges.

---

Eugene Johnson was employed for many years by Goodyear Tire and

Rubber Company (Goodyear). Goodyear maintained a group disability income

policy (Plan) with Liberty Life Assurance Company of Boston (Liberty Life).[1]

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]     Mr. Johnson misnamed the defendant in his complaint as "Liberty Mutual Assurance Company" and he has perpetuated this error on appeal. We follow the lead of the district court, *see* Aplt. App., Vol. I, at 7 n.1, by correcting the caption to reflect the defendant's true name.

Liberty Life administered the Plan, in which Mr. Johnson was a participant. After the Plan denied his application for long-term disability benefits and upheld the denial in administrative appeals, he challenged its decision in federal district court under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 (ERISA). The district court upheld the Plan's denial of disability benefits.

On appeal, Mr. Johnson argues that: (1) the district court should have required Liberty Life to demonstrate the reasonableness of its decision by a preponderance of the evidence rather than by substantial evidence; (2) the evidence demonstrated that Liberty Life acted in bad faith, requiring a higher level of scrutiny by the district court than it applied; and (3) Liberty Life and the district court ignored the effect of the pain medication he takes on his ability to work.

**FACTS**

**1. Application for Benefits**

Mr. Johnson injured his back in May 1996 while lifting 80 pound wire spools at the Goodyear plant in Lawton, Oklahoma. He returned to work at Goodyear on restricted duty beginning October 31, 1996. He continued to suffer from back pain. Over the next decade, in addition to back problems, he was treated for depression, psychotropic drug addiction, and hyptertension. Eventually, Goodyear placed him on medical leave status in July 2004.

Mr. Johnson attempted to return to work at Goodyear in September 2004 on restricted duty. He was unable to complete a workday. He took a Lortab tablet for back pain that day and was sent home since he was on narcotic medication. He has not worked since. He applied for long term disability benefits under the Plan on July 7, 2005.

## 2. Medical Evidence

On November 18, 2005, Dr. Richard Campbell, Mr. Johnson's primary physician, wrote to Liberty Life describing Mr. Johnson's condition and diagnoses. He stated that Mr. Johnson suffered from

> herniated nucleated propulsus at L5-S1, with continued back pain, now chronic pain syndrome, and radiculopathy. He also has depression, with episodes of anxiety and hopelessness, as well as erectile dysfunction. . . . In my opinion . . . [he] has a permanent disability, is not a surgical candidate, and he should be totally disabled from Goodyear.

Aplt. App., Vol. II, at 235.

Neurosurgeon Dr. Stephen Cagle, who saw Mr. Johnson originally in 1996 as a second opinion concerning back surgery, examined him again in 2004 and stated:

> It is my opinion that conventional surgery would not be very effective in this case. I suspect if surgery had to be done based on a deteriorating neurological condition, some type of fusion would have to be thrown in. With three levels of disease that would not bode well for him. Therefore, it is my opinion he needs to seek a physical medicine consultation to maximize his conservative measures and support. I think he should avoid surgery. I think he should consider

permanent light duty or medical retirement. I personally would favor medical retirement.

*Id.* at 278.

Beginning in the fall of 2004, Mr. Johnson was treated for his back pain by Dr. Darryl Robinson. On January 19, 2005, Dr. Robinson opined, based on a functional capacity evaluation, that Mr. Johnson should be limited permanently to

occasional lifting of up to 25 pounds, with frequent lifting of up to 10 pounds. Pushing and pulling should be limited to 10 pounds. He should have restricted walking, standing, and sitting with the opportunity to alternate positioning on a p.r.n. basis for symptom reduction. *He is not to operate machinery and should not drive a commercial vehicle.* No repetitive bending, twisting, or stooping is suggested. In general, his activities should be limited to those in the light duty category.

*Id.* at 285-86 (emphasis added).

Dr. Douglas Brady, a psychologist, diagnosed Mr. Johnson on December 2, 2005, with a number of mental impairments arising from his physical conditions, including a mood disorder, anxiety disorder, and insomnia. He assigned him a GAF score of 50 and stated that his prognosis was "guarded." *Id.*, Vol. I, at 198.[2] Dr. Brady also completed a mental status evaluation in which he noted that Mr. Johnson's affect was "blunted" and "flat" and that his mood was "depressed."

---

[2]     "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning. . . . A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." *Langley v. Barnhart*, 373 F.3d 1116, 1123 n. 3 (10th Cir. 2004) (quotations omitted).

*Id.* at 201. The evaluation noted that he suffered from "severe depression/pain disorder." *Id.*

Dr. Hugh McClure, a chiropractor, provided an opinion in February 2005 for worker's compensation purposes that Mr. Johnson had reached maximum medical improvement and was temporarily totally disabled. He stated that Mr. Johnson would "be unable to return to any occupation he has been trained or experienced in performing." *Id.*, Vol. II, at 334. He believed, however, that Mr. Johnson was a good candidate for vocational rehabilitation. *Id.*

Liberty Life obtained a medical review from Dr. Gale Brown. On December 22, 2005, Dr. Brown diagnosed Mr. Johnson with "[c]hronic low back pain with chronic right lower extremity radiculopathy"; "[c]hronic narcotic usage and presumed dependency, superimposed on a history of psychotropic drug addiction"; "[d]epression and anxiety disorder"; and hypertension. *Id.*, Vol. I, at 225. He opined that Mr. Johnson had the following "reasonable *physical* restrictions/limitations":

- Occasional stand/walk, 5-10 minutes per session

- Frequent sitting, 15-20 minutes per session

- No repetitive bending/twisting/squatting/stooping/kneeling/crouching

- Occasional lifting/carrying/pushing/pulling up to 20 pounds

- Occasional stair climbing; no ladder climbing

- No on-the-job driving, operation of hazardous machinery, working from unprotected heights, balancing.

*Id.* He further opined that "[w]ith accommodation for these restrictions, from a strictly physical perspective, Mr. Johnson retains the physical capacity to resume full-time work." *Id.* at 224. His report, however, did "not take into consideration Mr. Johnson's co-morbid conditions of depression, anxiety, and alleged cognitive impairment," which Dr. Brown concluded might require further review by a psychologist. *Id.*

Accordingly, Liberty Life obtained a further review, focusing on mental issues, from psychologist Dr. Janeen Montgomery. After reviewing Mr. Johnson's medical records, she opined on February 14, 2006 that "[f]rom a psychological perspective, there is no objective evidence of any restrictions and limitations on [his] work activities." *Id.* at 193. She noted that his treating psychologist had only seen Mr. Johnson on three occasions, on July 26, August 4, and November 30, 2005, a factor inconsistent with a serious psychological condition. *Id.* at 191, 193. She further opined that

> [t]here is insufficient evidence to support any restrictions and limitations from a psychiatric perspective during the time period 7/7/04 [the alleged onset of disability] through 7/7/05. Again there is no indication that he cannot conduct activities of daily living. There is no objective information to support cognitive impairment. His treatment is at a significantly low level; not indicative of someone who is impaired or has restrictions or limitations.

*Id.* at 194.

Finally, Isernhagen Work Systems conducted a two-day Functional Capacity Evaluation of Mr. Johnson in January 2005. The examiner noted that Mr. Johnson gave maximal effort on 22 of 27 test items but failed to work to maximum abilities on five test items. *Id.*, Vol. II, at 307. While his physical abilities could not be completely determined due to self-limiting behavior, and Goodyear did not request an evaluation of his physical demand level, the examiner determined that he met a light exertional level on the right hand carrying test.

### 3. Administrative Proceedings

Liberty Life issued its initial denial of benefits on October 24, 2005. Its denial letter indicated that it had reviewed medical information obtained from Drs. Campbell, Cagle, and Robinson, along with pharmacy records from Goodyear Pharmacy. Based on this information, along with a review of the file by a vocational specialist, Liberty Life concluded that Mr. Johnson retained the ability to perform a number of occupations, including "Expediter," "Dispatcher," "Routing Clerk," "Business/Badge Security Guard," and "Parking Lot Attendant." *Id.*, Vol. I, at 188. He therefore did not meet the Plan definition of disability as of July 7, 2005.

Mr. Johnson appealed the initial denial of benefits, and provided additional medical information with his appeal, including the opinions of Drs. McClure and Brady. On February 16, 2006, Liberty Life issued a final decision upholding the

initial denial.  The decision indicated that Liberty Life had conducted a claims investigation based on the information provided from Drs. Robinson, Campbell, Brady, McClure, and Cagle.  The decision adopted the physical restrictions detailed by Dr. Brown in his December 22, 2005 report.  Liberty Life further relied on Dr. Montgomery's report of February 14, 2006, concluding that Mr. Johnson had failed to provide objective evidence of a psychological restriction on his work activities.  The decision identified five jobs that Mr. Johnson could perform, the same five contained in the initial decision.  It concluded that "[a]lthough [Mr. Johnson] may continue to experience some symptoms, based on the medical documentation provided he does not meet the definitions under the terms of [Goodyear's] long-term disability policy. Therefore, benefits are not payable."  *Id.*, Vol. II, at 468.

## ANALYSIS

### 1.  Standard of Review

We review de novo a district court's decision regarding the appropriate standards of review of a plan administrator's decision, as well as its application of the proper standards to the administrator's determination of benefits under an employee benefit plan.  *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1167 (10th Cir. 2006).  When we review decisions concerning ERISA claims, "our review is confined to the administrative record."  *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

-8-

Mr. Johnson asserts that the district court did not apply an appropriate standard of review to Liberty Life's decision to deny him disability benefits. As the district court noted, courts review a plan administrator's decision de novo unless the benefit plan gives the administrator authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The parties agree that the Plan gives discretionary powers to Liberty Life. Where a plan grants its administrator such discretionary powers, "we are required to uphold the decision unless arbitrary and capricious." *Adamson*, 455 F.3d at 1212. "In applying the arbitrary and capricious standard, the decision will be upheld so long as it is predicated on a reasoned basis." *Id.*

The high deference accorded to a plan administrator's decision under the arbitrary and capricious standard is reduced, however, when the administrator operates under a conflict of interest. *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1004 (10th Cir. 2004). As both administrator and insurer of the Plan, Liberty Life operates under an inherent conflict of interest. For this reason, as the district court correctly noted, a reviewing court applies a "less deferential arbitrary and capricious standard," which requires Liberty Life to bear the burden of proving the reasonableness of its decision. *See id.* at 1004-06. Specifically, as plan administrator, Liberty Life must show "that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is

-9-

supported by substantial evidence." *Id.* at 1006. "Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion." *Adamson*, 455 F.3d at 1212. It "means more than a scintilla . . . yet less than a preponderance." *Id.*

Mr. Johnson contends, however, that a further reduction in deference is necessary because the conflict of interest in this case was so severe that a "second tier" of heightened scrutiny should be applied. *See* Aplt. Opening Br. at 14. He contends that this higher-level scrutiny requires Liberty Life to justify its decision, not only by substantial evidence, but by a preponderance of the evidence, something the district court did not require. In support of his argument, he quotes without attribution from the earlier, superseded version of *Fought*, presenting his quotation involving the preponderance standard as though it were extracted from the present version of our opinion. *See id.* at 15 (quoting *Fought v. Unum Life Ins. Co. of Am.*, 357 F.3d 1173, 1184-85 (10th Cir. 2004), *vacated on petition for rehearing by Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 998-99 (10th Cir. 2004)). In reality, neither the quoted language concerning proof by a preponderance of the evidence, nor the "first and second tier approach," *see Fought*, 357 F.3d at 1182-85 (superseded version), appears in the current and authoritative version of *Fought*.

In fact, the preponderance-of-the-evidence approach is inappropriate in a case like this one, which does not involve de novo review by the reviewing court.

-10-

It was not the applicable standard at the time Mr. Johnson filed his brief in this court, long after the prior version of *Fought* had been vacated. The district court did not apply an improper standard by requiring Liberty Life to justify its denial by substantial evidence.

### 2. Application of Substantial Evidence Standard

Mr. Johnson also argues that even under a substantial evidence standard, the district court failed to subject Liberty Life's decision to an adequately intensive review. He contends that there is evidence that Liberty Life acted in bad faith that should have caused the district court to scrutinize its evidence and reasoning processes more intensely than it did. Specifically, Mr. Johnson argues that surveillance conducted in connection with his worker's compensation claim, along with adverse or skeptical comments in his worker's compensation file, illustrates Liberty Life's bad faith approach to his disability claim.

We are unable to conclude from the mere fact that surveillance was conducted that Liberty Life acted in bad faith. As a general matter, "there is nothing procedurally improper about the use of surveillance" in connection with the investigation of a disability benefits claim. *See Delta Family-Care Disability & Survivorship Plan v. Marshall*, 258 F.3d 834, 841 (8th Cir. 2001). Even if there are circumstances where the use of surveillance could demonstrate bad faith, under the facts of this case, it does not.

The surveillance was not ordered in connection with Mr. Johnson's claim for disability under the Plan, but was conducted as part of his worker's compensation proceeding.[3]  The surveillance was initiated after the employee handling Mr. Johnson's worker's compensation claim received a report from Goodyear that the police chief of Temple, Oklahoma had called, stating that Mr. Johnson had been "causing multiple problems in town" and "riding [a three-] wheeler."  Aplt. App., Vol. II, at 377.  While Liberty Life employees apparently did share information and medical records with the employees handling his worker's compensation claim, Liberty Life did not expressly rely on the surveillance results in denying him disability benefits.  We conclude that the video surveillance, and the comments in the worker's compensation file adverse to Mr. Johnson, do not demonstrate bad faith on the part of Liberty Life.

### 3.  Narcotic Drug Dependency

Mr. Johnson contends that it was unreasonable for Liberty Life "to determine that [he] was not disabled and in fact capable of light duty."  Aplt. Br. at 19.  He argues that this finding is inconsistent with Goodyear's decision not to permit him to resume an available "light duty" position because of his dependency on narcotic pain medication.  This argument misperceives Liberty

---

[3]     It appears that an employee of Liberty Mutual Insurance Company, a parent corporation of Liberty Life, *see* Aplee Br. at i (corporate disclosure statement) was responsible for handling the worker's compensation claim and for initiating the surveillance.  *See, e.g.,* Aplt. App., Vol. II, at 370.

Life's determination. Under the Plan, the issue was not whether he could perform "light duty" work at Goodyear; it was whether he could perform the duties of any occupation. The Plan specifies that Mr. Johnson is only considered disabled if he "is unable to perform the Material and Substantial Duties of Any Occupation." Aplt. App., Vol. I, at 67.

A vocational analyst found several jobs that Mr. Johnson could perform in the "sedentary to light" category. Liberty Life relied on these jobs in determining that he was not disabled. *See id.*, Vol. II, at 468. As Liberty Life explained in its letter denying his appeal:

> We are not required to ensure the availability of these occupations or that he return to Active Employment with his former employer in the same or [a] different position. We determine whether he is capable of performing the duties of any alternative occupation.

*Id.*

Mr. Johnson further argues, however, that the conclusion that he could do these jobs is flawed because Liberty Life did not take into account the effect of his dependency on painkillers on his ability to work. He contends that neither the psychiatric report from Dr. Montgomery nor the vocational expert's report factors in his narcotic dependency. This argument fails to recognize Dr. Robinson's opinion of March 14, 2005, in which he stated that Mr. Johnson's medications, including the narcotic painkillers he takes, would prevent him from being able to operate machinery or a commercial vehicle. *Id.* at 284. Mr. Johnson fails to

-13-

show that this restriction is unreasonable. In the "transferable skills analysis"
portion of the vocational expert's report, she adopted this restriction, and the five
jobs she listed did not require operating machinery or commercial vehicles. *Id.* at
274. Thus, Liberty Life took the effect of Mr. Johnson's narcotic medications
into account in determining that he retained the ability to work.[4]

The judgment of the district court is AFFIRMED.

Entered for the Court


David M. Ebel
Circuit Judge

---

[4] Mr. Johnson also argues that one of the five jobs listed, expediter, is
essentially the same as his former job as a scheduler at Goodyear. He offers no
evidence for this assertion, however. In any event, the vocational expert
identified four other jobs that he could perform.